## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| ANDREA N. HUELS | : | |
| | : | |
| Plaintiff | : | |
| | : | |
| | : | CIVIL ACTION FILE NO. |
| v. | : | _____ |
| | : | |
| | : | |
| LENOVO (UNITED STATES) INC. | : | |
| | : | |
| Defendant | : | |
| _____ | : | |

## COMPLAINT

Plaintiff Andrea N. Huels ("Plaintiff" or "Huels") files her

Complaint against Defendant Lenovo (United States) Inc. ("Lenovo" or

"Defendant")

## NATURE OF THE ACTION

1.

This is an action for sex discrimination under Title VII of the

Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*. as amended ("Title

VII"), age discrimination under the Age Discrimination in Employment

Act of 1967, 29 U. S. C. § 621, *et al.* as amended ("ADEA"), and breach

of contract under Georgia law.

## PARTIES

### 2.

Plaintiff Andrea Huels is a female U.S. citizen and resident of Fulton County in the State of Georgia. At the time of her termination, she was 56 years old.

### 3.

Defendant Lenovo (United States) Inc. is a corporation formed and operating under the laws of Delaware with its principal office address at 8001 Development Drive, Morrisville, North Carolina, 27560. Lenovo is subject to actions under Title VII and the ADEA, and can be served with summons and complaint upon its Registered Agent: C T Corporation System, 289 S Culver St., Lawrenceville, Georgia, 30046-4805.

## JURISDICTION AND VENUE

### 4.

The claims brought in this lawsuit present federal questions and jurisdiction in this court is proper under 28 U.S.C. § 1331. In addition, this court has supplemental jurisdiction over the breach of contract claim under 28 U.S.C. § 1367.

5.

Venue of this suit is proper in the Northern District of Georgia, Atlanta Division, under 28 U.S.C. § 1391. The alleged acts against Plaintiff occurred in this judicial district and division because Defendant contracted with Plaintiff to perform her work here in Georgia.

6.

Plaintiff perfected a charge against Defendant with the Equal Employment Opportunity Commission on January 28, 2022.

7.

The EEOC issued a Notice of Right to Sue to her on or about February 20, 2024.

## FACTUAL ALLEGATIONS

8.

Lenovo is a global company that sells PCs, workstations, servers, storage solutions, IT management software, smart TVs, tablets, smartphones, and apps.

**Lenovo hires Huels (but never mentions Intel).**

9.

Lenovo recruited and hired Huels to begin as a Business Development Manager-Artificial Intelligence ("BDM-AI") on June 7, 2021.

10.

The job description stated, "consider joining Lenovo as an AI Evangelist & Business Development Manager."

11.

Nothing in the job description limited Huels to working with any particular partner or alliance (Intel or otherwise), but only describes her role as developing enterprise client AI opportunities.

12.

Neither the offer letter nor the job description stated that it was a "partner-funded" role within Lenovo.

13.

Neither the offer letter nor job description mentioned Intel, or its flagship product, the Central Processing Unit, more commonly known as the CPU.

14.

At no time during the interview process or the salary negotiations with Huels, did anyone tell her that her role would require her to prioritize Intel, that Intel funded her salary, or that her compensation structure would be highly dependent upon generating Intel sales.

15.

If anyone had done so, Huels would have never accepted the job because Intel's presence in the AI market was minuscule compared to NVIDIA's.

16.

NVIDIA invented the Graphic Processing Unit ("GPU"), which enabled almost all early AI innovations. NVIDIA's early focus on GPU-accelerated computing for AI, coupled with its ecosystem and technology advancements, gave it a significant edge in dominating the AI hardware market. This dominance contributed to the widespread adoption of GPUs for AI across various industries.

17.

GPUs are more efficient for large-scale parallel processing tasks because of their architecture, which allows for higher throughput for tasks involving large amounts of data, like deep learning. GPUs can process multiple computations simultaneously. These accelerators are optimized to perform high-volume, complex calculations at high speeds, crucial for efficient deep learning.

18.

NVIDIA still dominates the AI chip market, holding an estimated 90% market share for AI GPUs. This significant lead is due to their early

recognition of AI trends and comprehensive offerings in chips, software, and specialized computers.

19.

Intel is more known for traditional CPUs and has faced challenges in establishing a foothold in the AI space.

20.

For AI applications, Intel's CPU chips were a far inferior product to NVIDIA's GPU chips. While the GPU handles specific tasks related to AI computations, the CPU takes care of more general computing tasks. This includes running the operating system, managing input/output operations, executing non-AI related processes, and other system-level tasks.

21.

Intel had a minimal presence in the AI chip market, with virtually no significant market share.

22.

During Huels' tenure at Lenovo, using Intel CPUs was only possible in the most simplistic AI applications.

23.

Huels had never worked with Intel, nor did she know anyone in their organization.

24.

Instead, Huels had extensive experience working with NVIDIA at her prior employer, Dematic.

25.

An integral part of Lenovo's interview process with Huels was to have her prepare a sales strategy presentation for a fictitious customer called "Buy More" and present it to the Lenovo panel.

26.

Huel's presentation highlighted NVIDIA as a critical partner for AI success. She mentioned NVIDIA and their GPUs on four slides but not Intel.

27.

During the interview process, Huels provided a writing sample that outlined her experience collaborating with NVIDIA in Enterprise AI, emphasizing the pivotal role of its GPUs in driving forward almost every AI innovation.

28.

After Lenovo offered Huels her job, she conferred with NVIDIA's VP & GM of Global Retail, QSR, and Supply Chain, who recommended that she accept the position.

29.

Huels' experience working with NVIDIA led Lenovo to offer her this job.

30.

If Huels had been limited to promoting Intel CPU solutions for Enterprise clients, she would have failed miserably.

31.

Her direct supervisor was Robert Daigle, Sr. Manager, Marketing Strategy & Planning ISG HPC/AI.

32.

Daigle explained that she would have a "dotted line" reporting relationship to Francois Corradino, Director of HPC & AI Sales, to facilitate coordination and communication of AI sales opportunities. However, Daigle clarified that she would always be part of the WW AI Business Unit, not the Sales team.

33.

Lenovo memorialized this in her offer letter.

**Huels' Pay Structure.**

34.

Under the offer letter, Huel's pay structure was designed to be

8

80 percent base salary and a 20 percent incentive-based compensation.

35.

Combined, these two components made up her On-Target Earnings (OTE), the compensation she would earn in total if she achieved 100% of her performance targets.

36.

The incentive-based compensation was guaranteed for the first six months, and then extended another four months based on the extended sales cycle required to close Enterprise AI opportunities.

37.

Huels' offer letter also stated, "Lenovo's incentive plans are designed to drive results focusing on growth and market share. Over-achievement of your incentive objectives can result in significant upside earnings. Incentive payments are earned monthly."

**Huels' 2021-22 KPIs.**

38.

One of Huel's 2021-2022 Key Performance Indicators ("KPIs"), which Daigle approved, was to "Strengthen our NVIDIA Alliance."

39.

Huels drafted her KPIs based on Daigle's KPIs, which he shared with her when she joined Lenovo.

40.

Huels' KPI objective of "Double our YoY revenue with NVIDIA" was copied from Daigle's KPI document.

41.

Neither Daigle nor Huels had KPIs for growing Intel's revenue in their 2021-2022 objectives.

42.

As expected, almost all Huels' Fiscal Year 2021-2022 business development generation involved NVIDIA, not Intel.

43.

Daigle and his supervisor, Scott Tease, Lenovo's Vice President GM HPC and AI Infrastructure Solutions Group, approved all of these efforts.

44.

For example, in October 2021, Huels negotiated a deal with the National Retail Federation (NRF) for NVIDIA and Lenovo to co-sponsor the Innovation Lab at the largest retail show in North America, held the following January in New York City. Daigle and Tease approved.

45.

Huels negotiated a contract under which NVIDIA and Lenovo would co-sponsor a "Big Ideas" thought leadership panel and speak together at the National Retail Federation ("NRF")'s Big Show conference in January 2022. The NRF is the world's largest retail trade association. The NRF Big Show brings together more than 6,200 brands from around the globe to New York City every year for a three-day retail conference (the largest retail conference in North America). Daigle and Tease approved.

46.

Huels negotiated for Lenovo and NVIDIA to be the Gold Sponsors of the Loss Prevention Research Council (LPRC) and to speak together and sponsor their annual IMPACT conference. Daigle and Tease approved.

47.

Huels negotiated NVIDIA pricing support for the [REDACTED Customer Name]'s AI Automated Order Taking ("AOT") project at Daigle's direction.

48.

Huels spoke on three panels at NVIDIA's GPU Technology Conference ("GTC") conference, and Daigle approved each.

49.

In January 2022, Daigle asked Huels to do a webinar with NVIDIA for Lenovo's Winterstock event – knowing full well that Intel was also a sponsor.

50.

There were many other times when Daigle directed Huels to publicly support NVIDIA, not Intel.

51.

On February 9, 2022, Daigle sent Nicholas Borsotto (WW Manager Lenovo AI Innovators) and Huels an email with the Subject line "RE: Manifest, Lenovo, Nvidia & [REDACTED]." He stated:

> Lastly, when it comes to working with NVIDIA, we should be working closely with them to uncover new opps and open doors but let's be careful how/when we bring them into NDA briefings or how we engage with them in a public forum. Intel funds the majority of our AI business today and we shouldn't 'bite the hand that feeds us.'

**Huels' 2022-23 KPIs.**

52.

On March 26, 2022, six days before the new fiscal year started on April 1, 2022, Huels shared her proposed 2022-2023 KPIs by email with Daigle and asked for his "feedback and a quick accuracy check on the numbers."

53.

Without any discussion, Daigle responded, "these KPIs look good. I would leave off the NVIDIA aspect and maybe generalize it to 'vendors & alliance partners' so we're not specifying NVIDIA. If anything, we need your KPIs aligned more to Intel to support project [REDACTED] activities."

54.

Huels made the changes and re-submitted her KPIs.

55.

At the time, Huels did not know that Daigle was trying to avoid creating any document that would show that he actually encouraged her to pursue business development with NVIDIA.

**Huels' Successful Performance.**

56.

On March 30, 2022, Daigle sent an email to the Global AI team announcing that Huels had won an award:

> Andi Huels Leads our North America Business Development efforts for AI and has been instrumental in driving deep relationships with retail ISVs and customers that are resulting in real business opportunities. By leveraging event speaking and thought leadership, she has found new ways to showcase our customers successes with [REDACTED] and our retail ISV partnerships with [REDACTED] and more. Andi has also supported channel training and engagements to bring the full ecosystem together for Retail AI.

57.

NVIDIA GPUs were used in each of these business development efforts.

**Huels' Minimal Raise and Incentive Compensation despite her "Strong" Performance Review.**

58.

Because Huels' employment with Lenovo started on June 7, 2021, she completed her first fiscal year of employment on March 31, 2022.

59.

Despite this award-winning job performance, Daigle never gave Huels her annual performance evaluation or discussed whether she would receive a raise.

60.

When Huels found her fiscal year 2021-22 evaluation in the Company portal, it was dated March 31, 2022.

61.

She discovered that Daigle's Overall Evaluation Performance Rating for Huels consisted of one word: "Strong." Tease approved the rating.

62.

This evaluation stated that it meant to track her performance (KPIs and Year-End Performance) from "04/01/2021 – 03/31/2022."

63.

Huels had built a $[REDACTED] business opportunity pipeline and closed major deals with Restaurant, Retail, and Supply Chain Enterprise customers.

64.

Huels only received a 3% raise, but Daigle never communicated this to her.

65.

Daigle never met with Huels to discuss her performance review, give her developmental feedback, or inform her of her raise.

66.

Upon information and belief, Daigle met with other younger male BDMs he supervised to give them full performance reviews and more substantial raises.

67.

In addition, despite her "strong" performance, upon Tease and Daigle's recommendation, Lenovo paid these younger male BDMs a larger percentage of their incentive compensation than Huels after her 10-month ramp-up period ended.

**Daigle changes Huels' official title and assigns her a sales quota.**

68.

On April 1, 2022, without any discussion, Daigle changed Huels' title to "Pre-Sales Rep 80/20 – HPC" and assigned her a $15 million sales quota, which none of the other BDMs (all younger males) were assigned. HPC stands for High-Performance Computing ("HPC"), which were not the Lenovo products or AI use cases it hired Huels to develop.

69.

HPC is used to process highly complex computations that involve large-scale data processing, and generally involves the use of supercomputers or clusters of powerful servers with high-speed networking and are hosted in data centers.

70.

In contrast, Edge AI refers to performing AI computations at or near the source of data generation (e.g., retail locations) rather than transmitting data to a centralized cloud or data center. It typically involves Edge AI servers, which are much smaller than those used in data centers, and they each generally have a GPU and a CPU.

**Huels finds out that Intel funded her salary for the first time.**

71.

On May 19, 2022, almost a year after Huels began working for Lenovo, Huels was returning home from a Lenovo-sponsored conference called Accelerate in Las Vegas.

72.

Huels spoke on two panels at the conference, one with NVIDIA, and the other with Intel. Tease and Daigle approved and attended the conference.

73.

Huels and [REDACTED], the Intel Sales Enablement Manager assigned to Lenovo, were on the same flight back to Atlanta.

74.

After they landed in Atlanta, [REDACTED] approached Huels as she exited the gate, and angrily stated, "You're doing way too much with NVIDIA. You know I pay your salary?"

75.

Huels replied, "No, you don't, Lenovo pays my salary. Their name is on my paychecks."

76.

[REDACTED] explained that Intel gave Lenovo Market Development Funds called "[REDACTED] funds" and asserted that part of that money went to fund her salary.

77.

Huels told him that she knew that Intel's "[REDACTED] Funds" supported Lenovo's AI business but that no one ever told her that her salary was paid from those funds.

78.

Huels elaborated that Intel was not mentioned in the job description or during the interview process.

79.

She explained that none of her performance metrics specified Intel sales, business development, or products and that she had joined Lenovo on NVIDIA's recommendation.

80.

The Intel Sales Enablement Manager insisted that Intel paid her salary, so she told him she would follow up with her manager.

81.

On May 23, 2022, Huels sent Daigle a message about her conversation with [REDACTED] asking, "Am I funded by NVIDIA, Intel, or Lenovo?"

82.

Daigle replied, "Intel. . .yeah, we have to play nice with Intel."

83.

Huels responded, "Can we change that? I don't feel comfortable knowing I'm supposed to favor one supplier."

84.

Daigle responded, "At the end of the year you will convert to Lenovo funded but until then, it will remain Intel funded."

85.

Huels realized that Daigle and Tease were knowingly using Intel's "[REDACTED] Funds" to pay her salary while incentivizing her to develop business with Intel's competitor, NVIDIA.

86.

Since Huels began her role in June of 2021, Daigle encouraged and directed her to use her experience and existing relationship with NVIDIA (particularly in Retail, Restaurant, CPG, and Supply Chain) to focus on business development for NVIDIA's GPU solutions, to promote NVIDIA at industry events, to include NVIDIA in thought leadership panels, and to introduce NVIDIA to enterprise clients.

87.

Managers throughout Lenovo congratulated Huels for her business development with NVIDIA.

88.

Despite Huels communicating to Daigle months in advance that her son was graduating from High School in Georgia on May 23, 2022, he planned an Intel partnership meeting at Lenovo's North Carolina corporate headquarters for May 23-24, 2022. Huels attended the graduation and arrived in North Carolina on May 24, 2022.

89.

While there, Huels took the opportunity to apologize to [REDACTED], Intel's Edge Solutions Global Sales Director. She explained to him that she did not realize Intel funded her salary until recently.

90.

On June 10, 2022, Daigle admonished Huels for publicly admitting to [REDACTED] that she did not know that Intel funded her salary.

91.

Although having "[REDACTED] Funds" from a partner is entirely different from being a funded headcount, Daigle falsely memorialized in a June 10, 2022 email that they had "spoken many times about your [headcount] funding with Intel."

92.

Apparently, Daigle had not taken responsibility for his duplicitous instructions and sought to throw Huels under the bus.

93.

At this time, Huels knew that she was dealing with an internal integrity violation involving both Daigle and Tease.

94.

On July 11, 2022, Daigle sent Huels an email asking her to re-write the 2022-2023 KPIs she submitted in March to focus exclusively on Intel:

> Specifically for Intel, we are working on a 60-day turnaround to ensure we're meeting Intel expectations for AI investments in NA including your headcount funding. You are funded by Intel and are expected to look for opportunities to lead with Intel. This doesn't bar you from speaking with other vendors, but you cannot be visibly publicly with them and should always look for opportunities to lead with Intel. If another vendor approaches you with an opportunity that you think would be a conflict of interest, please raise it to myself or Francois and we can help identify a substitute to cover it.

95.

Huels made the changes and re-submitted her KPIs.

96.

Despite her revised KPIs, Daigle continued to ask Huels to support NVIDIA.

97.

So, Huels routinely pushed back on Daigle's requests because it made her feel uncomfortable and ethically conflicted.

98.

For example, on June 20, 2022, Daigle asked Huels if she could attend the Lenovo + NVIDIA Retail Conference Review calls for the remainder of 2022-2023.

99.

On June 30, 2022, Daigle asked Huels to contact NVIDIA for pricing support for a customer.

100.

On June 27, 2022, Huels was asked by a colleague to help with a video for the new NVIDIA Alliance web page. On July 1, 2022, she sent Daigle an email asking, "If my focus is Intel, shouldn't Crystal [Crawford] be handling this?" Crystal Crawford was the WW NVIDIA Alliance Manager.

101.

On July 8, 2022, Daigle emailed Huels, "Can you follow up with [REDACTED] with pricing and explanation?" He was referring to [REDACTED], NVIDIA's VP & GM of Retail, QSR & Supply Chain.

102.

On August 10, 2023, Huels emailed Daigle to ask him to participate in an upcoming webinar because she recently discovered it was sponsored by NVIDIA. Even though NVIDIA wasn't participating in the webinar, Huels stated: "The social media posts will say NVIDIA, so I'm out."

103.

This conflict in direction caused Huels tremendous stress and anxiety because not only was NVIDIA her closest partner, but their GPU product was crucial to reaching her business development objectives.

104.

At that time, Intel did not sell what the AI market demanded. The AI market wanted GPU chips. The combination of GPU's parallel processing power, optimization for AI workloads, NVIDIA's dominance in the AI hardware market, and the strong ecosystem surrounding its GPUs contributed to their far superior sales compared to Intel CPUs for AI applications.

105.

NVIDIA represented almost all of Huels' business development.

106.

Lenovo had yet to qualify Intel's new GPU called Arctic Sound for Lenovo products.

107.

Intel's Arctic Sound GPU was not even commercially available until the Third Quarter of 2022.

108.

On August 1, 2022, Huels emailed the Global AI team to share that Lenovo had lost a customer opportunity to a competitor because Intel told her on the bi-weekly pipeline call that Lenovo was "way behind on Arctic Sound."

109.

By email response, Tease admonished her for admitting this fact and sought to humiliate her by copying the Global AI team.

110.

Daigle then reprimanded Huels to the Global AI team for including Tease in the email distribution.

111.

Daigle admitted that Intel had not even provided Lenovo with Arctic Sound GPU samples, and Lenovo had not slated Arctic Sound GPUs for Lenovo's portfolio of products, yet this was Intel's flagship product for which Huels was supposed to be developing business.

112.

Rather than apologize and take ownership of the misappropriated Intel "[REDACTED] Funds," Daigle and Tease blamed Huels and made defamatory comments about her character to her peers.

113.

Two of her teammates, Nicholas Borsotto and Crystal Crawford, told her that Daigle accused her of lying and said that Huels had always known her headcount was Intel-funded.

114.

It became apparent that Tease and Daigle, both males, sought to throw Huels, an older female, under the bus to divert attention and responsibility from themselves.

115.

In response, Huels focused her attention on promoting Intel by leading bi-weekly partnership calls with Intel's Global AI team.

116.

Huels collaborated with [REDACTED], Intel's Lenovo Sales Enablement Manager, to build a [$ REDACTED] pipeline of enterprise AI opportunities, including an AI Proof of Concept deal with a nationwide chain of small-box discount stores.

117.

After May 2022, Huels included Intel representatives in multiple panel

discussions at industry conferences, including:

· Edge AI Summit - September 2022 in Santa Clara (Burnie Legette & Kristen Call)
· C-store of the Future Reception at NACS – September 2022 in Las Vegas (Kristen Call)
· Intel Innovation – September 2022 in San Jose (Alexander Erdman)
· Fortune Brainstorm AI – December 2022 in San Francisco (Wei Li)

118.

Huels posted at least sixteen LinkedIn posts promoting Intel and

Lenovo's joint participation in these events.

119.

Huels also collaborated with Intel on a presentation called "Intel +

Lenovo Enterprise AI Business Development Review," which she gave to the

Intel Global AI team on September 14, 2022.

120.

The Intel team communicated its appreciation for Huels' efforts several

times.

121.

Intel Sales Enablement Manager, [REDACTED], sent Huels several

emails praising her business development efforts. On October 24, 2022, he

wrote, "Good evening, Andi. I hope it came across as how impressed I am with what you have been able to accomplish."

123.

Plaintiff responded, "Thank you [REDACTED], your feedback means the world to me! I know we got off to a rough start, but I sincerely had no idea I was funded by Intel. Regardless, as Bryan Adams says, "Everything I do, I do it for you." Literally, every deal I close has Intel content. I'm your biggest fan!"

123.

Intel Sales Enablement Manager, [REDACTED], also sent an email to commend Huels for organizing a panel discussion featuring Burnie Legette and Kristen Call from Intel at the Edge AI Summit in September 2022: "Other than the big AMD logo over your heads it was a great panel!"

**The LinkedIn posts Lenovo ignored.**

124.

Huels posted all these public interactions with Intel on her LinkedIn profile.

125.

On September 27, 2022, Huels was in San Jose, California, attending Intel Innovation, Intel's largest technical conference of the year, as the only representative from Lenovo's Global AI team.

126.

Huels spoke on a panel moderated by Intel that afternoon.

127.

Later that day, Huels met and had a brief conversation with Intel's CEO, Pat Gelsinger, on the show floor.

128.

Subsequently, Intel employees told Huels that meeting Gelsinger was rare and that many of them had never met him.

129.

Huels posted a picture with Gelsinger on LinkedIn on September 27, 2022, and her post received over 3,000 impressions and 80 reactions.

130.

Remarkably, [REDACTED], Global DCAI Sales Director | Global Accounts | Lenovo Account Team for Intel, who was based in Raleigh, North Carolina, sent an email to Tease that same day, titled "feedback on Andi." DCAI stands for "Data Center Artificial Intelligence." [REDACTED] oversaw the sales strategy and execution for AI solutions within data centers, not the

edge AI solutions that Huels worked on. He never participated in a Global AI Team meeting.

131.

[REDACTED] was oblivious to Huels' efforts to promote Intel that very day, or the feedback she had received from Intel employees tasked with working with Lenovo.

132.

[REDACTED] is not connected with Huels on LinkedIn.

133.

Huels has never met him.

134.

At this time, no one at Lenovo had ever mentioned [REDACTED]'s name to her.

135.

Huels traveled straight from Intel Innovation in San Jose, California to Las Vegas, Nevada, where, on behalf of Lenovo, she helped co-sponsor a customer reception with Intel at the National Association of Convenience Stores (NACS) Conference.

136.

Huels spent almost all of September 2022 publicly promoting Intel.

**Huels receives a Sales Quota agreement.**

137.

On June 3, 2022, Huels received a DocuSign Sales Quota agreement stating that it began on April 1, 2022.

138.

The agreement provided that her incentive compensation was to be based on sales for the following acronyms: [REDACTED]

139.

Huels did not even know what these acronyms meant, let alone how to measure them. Huels helped sell AI hardware (HW), but none of these other products.

140.

It appeared that Daigle did not understand what these acronyms meant either.

141.

In contrast, younger male Business Development Managers were not subject to a sales quota.

142.

Huels understood that her sales quota amounted to Daigle's entire FY22-23 North America quota for Enterprise AI.

143.

On June 3, 2022, Huels emailed Daigle expressing concerns about how she could track all of the deliverables and asked if he could provide an example of how he tracked Enterprise AI revenue, profitability, and services in the past.

144.

Daigle minimized Huels' concerns, and compared the quota to that of HPC reps who sell into massive data centers.

145.

Huels' role was to develop sales for Edge AI use cases and services, not HPC products used in large data centers.

146.

Huels asked Daigle to put her on an incentive-based bonus structure identical to the male BDMs, but he refused, and insisted that she be subject to an HPC sales compensation structure.

147.

On June 4, 2022, Huels sent Daigle another email because she was concerned that her title on the Sales Quota agreement had been changed from "Business Development Manager" to "Pre-Sales Rep 80/20."

148.

Daigle's only response was to tell Huels she must sign the document.

149.

When Huels later asked Daigle how her efforts toward her other KPIs would contribute towards her incentive compensation, he responded, "they don't; you have to do those to keep your job."

150.

When Huels reached out to her peers for help, none could help her because they did not know how to measure Enterprise AI revenue, profitability, and services and did not have sales quotas.

151.

Huels repeatedly contacted Daigle to ask how to capture her revenue, profitability, and services, and requested assistance with the process, but he consistently deflected her.

152.

Daigle told her to contact the Sr. Mgr. Customer Ops in Scotland to obtain a global report of the number of NVIDIA GPUs sold and to contact a Sales Operations Manager in Brazil to ask him to create reports.

153.

Neither were able to provide the sales reports Huels needed to measure her revenue and profitability.

154.

When Huels asked Daigle how she could calculate Intel sales, he responded, "You can't; they don't have unique part numbers, so you won't know if it's AI or not."

155.

Thus, Huels could not measure the AI sales and profitability quotas Daigle assigned her, so he set her up to fail.

156.

Despite Daigle failing his managerial duty to set up accurate tracking for the sales and profitability quotas he assigned Huels, she kept asking him and others for help. Huels sent over a dozen emails to managers, including Daigle, Tease, Francois Corradino, the Executive Director, NA & LA Global Accounts, the Director of OEM Sales, the Channel Account Manager - Insight, the ISG Inside Sales Director, the Commission Analyst Team Leader, and even HR, trying to find the data she needed to calculate her sales.

157.

Huels was not a sales representative, so she did not receive purchase orders, or have access to the Lenovo system that allows sales representatives to pull their sales reports.

158.

When Daigle assigned Huels this sales quota, he knew that measuring AI sales had not been solved.

159.

Even Daigle's own 2021-22 KPIs had a caveat written in red letters: "contingent upon finance measurement tool." Thus, Daigle did not even know how to measure or track such results.

160.

Since Daigle knew there was no way to measure business development results for AI, he effectively stripped Huels of any incentive-based compensation Lenovo had contracted to pay her.

161.

On November 2, 2022, Huels contacted Arielle Ballard, Sr. HR Manager ISG, because she had not received any monthly incentive-based commission checks.

162.

Huels noted: "Based on the attached calculations, I've significantly exceeded my H1 sales quota. As you can see below, it's a difficult process to calculate this number and I didn't have access to most of the data sources I needed."

163.

Ballard responded that Huels needed to contact the Commission

Analyst Team Leader. She did not tell Huels his name, but Huels discovered

it was [REDACTED] in Argentina.

164.

Neither Daigle, Tease, nor Corradino had ever mentioned him to Huels.

165.

Huels immediately reached out to him with her concerns:

We haven't met yet, but I just heard your name on a call with
Francois. I'm on the NA AI team and I lead Business Development.
I'm the only AI BD Manager with a sales quota. I've had significant
challenges figuring out how to pull together the data for my sales
YTD for reasons detailed below. I've had to rely on other Lenovo
business leaders because I'm an overlay, rather than an actual
Sales Rep, so not all of my sales are in the LOAD report. Based on
the attached file called "NA Enterprise AI YTD LOAD PIPE," I've
calculated that my Sales + LOAD through 10/31/22 are
$[REDACTED]. This includes services, software, and options.
Please see below for a detailed description of how this number
was calculated. The CPS link I received from [REDACTED]
shows 13.93%, but I should be close to 200% of quota. I tried to
click to submit a ticket and put in a request to fix my CPS score,
but it gives me the following error message and won't allow me
to enter anything in the form: "No subscriber found'."

166.

The Commission Analyst Team Leader responded with a list of Huels'

"AI orders" and the accounts that her CPS score was based on, but they were

grossly inaccurate.

167.

Huels wrote back to him on November 9, 2022, to address the issues:

I am not in communication with anyone in Finance, so I don't know how they're accumulating this list without my input. I have significant orders missing. [REDACTED], for example, is my account and it's not in the spreadsheet you attached. The following 20 customers should be on my spreadsheet. Your spreadsheet also had two customers that are not mine: [REDACTED] and [REDACTED] (which is -297% profit)."

168.

In this email, Huels attached documentation to support these sales.

169.

Daigle and Corradino had never reviewed the account list with Huels, corrected it, or included her in calls with the Commission Analyst Team Leader, intentionally preventing the resolution of these issues. Daigle and Corradino knew of several accounts she was working with that were not included (e.g., [REDACTED]).

170.

In addition, Daigle and Corradino knew that Huels did not work with [REDACTED], a global automotive supplier based in Paris, France.

171.

By not removing [REDACTED], which was posting -297% profit, this negatively impacted her incentive-based compensation payments.

172.

This inclusion was meant to purposefully reduce Huels' incentive-based compensation to practically nothing.

173.

Huels' dotted-line manager, Corradino, immediately admonished her for contacting the Commission Analyst Team Leader to address the missing orders and inaccurate account list, stating that she should be working with Daigle and himself to calculate her sales.

174.

However, the only reason she approached the Commission Analyst Team Leader was because HR suggested she do so after neither Daigle nor Corradino had assisted her despite numerous requests for help.

175.

Huels had previously sent Corradino and Daigle a detailed email documenting how she calculated her AI sales for the prior six months. She attached the six reports she had collected from her colleagues, listed the people who helped her, shared the reporting challenges she faced, and summarized her first half of 2022-2023 results.

176.

Neither Corradino nor Daigle ever responded.

177.

Every month, the AI Business Development Managers from each Region shared their "Dashboards" with the Global AI team.

178.

Huels' November 2022 dashboard showed $[REDACTED] in revenue YTD. Huels monthly dashboards consistently showed the largest pipeline and revenue of her BDM peers.

179.

In contrast, the November 2022 dashboard of the EMEA AI Lead, a younger male Business Development counterpart in Europe, showed YTD sales of $[REDACTED], roughly a third of Huels' sales.

180.

Daigle never gave Huels any feedback that her dashboards were inaccurate.

181.

Daigle retroactively assigned the sales quota commission structure without implementing any means to track sales and profitability, hoping to sabotage Huels' receipt of incentive-based compensation and thereby force her to resign.

182.

Despite Huels surpassing her incentive-based goals, Daigle would not approve her incentive-based monthly payments.

183.

The result was that Huels was only paid 4.85% of the FY22/23 incentive compensation she was eligible to earn for the remainder of her employment.

184.

When she won a $1,000 Customer Reference Award, Lenovo refused to pay her the amount because it claimed it overpaid her incentive compensation.

185.

So, technically, Huels only received 2.7% of the incentive compensation she was eligible to earn in FY22/23.

186.

In contrast, Daigle approved a significantly higher percentage of incentive-based compensation for younger male BDMs than 2.7% even though their AI sales results were nowhere near as good as Huels'.

**Daigle and Tease Promote a Younger Male**

187.

At or around September 2022, Lenovo promoted Nicholas Borsotto, a younger male peer in his twenties on the Global AI team, who lived in Berlin, to WW ("World Wide") Business Development Manager & Head of Lenovo AI Innovators. Lenovo AI Innovators are software partners (ISVs).

188.

Huels was significantly more qualified for this position than Borsotto.

189.

Huels had over twenty years of experience leading teams at multi-billion-dollar corporations as a Director of Business Development.

190.

Immediately before Lenovo, Huels was employed as the Director of Business Development for Dematic (a global company with over $4 Billion in Annual Sales), with a team of seven employees reporting to her.

191.

Borsotto had joined Lenovo as WW Manager for the Lenovo AI Innovators one month after Huels started.

192.

Borsotto had never worked for a multinational corporation before working for Lenovo. His only employment experience was with small startups. He had no managerial experience.

193.

The new WW Business Development Manager role included responsibility over AI marketing, but Borsotto had no marketing experience. In contrast, Huels had been the Director of Marketing for multi-billion-dollar companies multiple times and had marketing teams report to her throughout her career.

194.

When Scott Weitzman, WW AI Marketing Manager, later joined the team in September 2022, he was immediately assigned to work for Borsotto, not Huels.

195.

Lenovo never posted or announced the WW Business Development Manager position internally.

196.

Daigle never informed Huels of the WW Business Development Manager opportunity or invited her to apply.

197.

Rather, Huels first found out about Borsotto's promotion after the fact from Crystal Crawford, another older female on the AI team.

198.

Then Tease announced Borsotto's promotion during his quarterly Global All Hands call.

199.

In its Position Statement to the EEOC, Lenovo contended that this was not a promotion because upon hire "Borsotto was mistakenly classified as a Band [REDACTED]" and Lenovo was simply correcting this mistake.

200.

Despite the alleged eighteen-month-old mistake, upon information and belief, Lenovo did not provide back pay to Borsotto.

201.

Borsotto announced his promotion on LinkedIn in September 2022 and described the expansion of his responsibilities, "I'm happy to share that I'm starting a new position as WW AI Business Lead & Head of Lenovo AI Innovators. I would like to thank Robert Daigle and Scott Tease for trusting me with this new responsibility."

202.

Daigle and Tease liked the post by giving it a "thumbs up."

203.

Neither Daigle nor Tease asked Borsotto to correct this post to state that it was merely a pay grade and title change.

204.

This new position gave Borsotto responsibility for AI business development and marketing for the global market (World-Wide), while Huels was limited to business development in North America.

205.

Because Lenovo did not post or announce the WW Business Development Manager position, Huels could not apply for it.

206.

On November 2, 2022, Daigle emailed the Global AI team to announce, "We have 3 team leads who are on a management track (Please congratulate them if you haven't already)." All three were younger males.

207.

At the bottom of the email, Daigle listed the only two women on the team, Crystal Crawford and Huels, and referred to them as "non-management/team lead Staff."

208.

Not once during the hiring process, nor afterward, had anyone at Lenovo ever communicated to Huels that she was not on a management track.

209.

Instead, Daigle had told Huels that his vision was that she would build a team of vertical market experts who would report to her, which led her to expect she was eligible for promotion to a managerial role.

210.

In fact, Huels expressed concern during the hiring process that she was being hired into an individual contributor role because she had not been in one for many years.

211.

Daigle never told her that she was on a non-management track or explained why.

212.

Her job description did not state that her position was a non-management track position.

213.

The only reason Huels was on the non-management track was that Daigle and Tease did not want to promote an older female.

**Lenovo posts Huels' position.**

214.

On October 31, 2022, less than two weeks before Daigle terminated Huels, her entire Global AI team received an email from Ryan Quinn, Sr. Talent Acquisition Partner, notifying them that Lenovo was hiring an AI Business Development Manager NA, and he was looking for referrals.

215.

But Huels was the AI Business Development Manager NA.

216.

No manager or HR employee had ever discussed with Huels that Lenovo was hiring for her role.

217.

The job description that Quinn attached to his email was almost identical to Huels'.

218.

The only real differences were that this position would report to Nicholas Borsotto instead of Daigle and required "Experience around GPU accelerators."

219.

No one ever encouraged Huels to apply for this position, which was not funded by Intel, and would allow her to publicly promote NVIDIA products.

220.

Even though it was only six months into the fiscal year, as of November 2, 2022, Huels YTD Revenue was $[REDACTED] versus her H1 goal of $[REDACTED] and her pipeline was $[REDACTED]. She had significantly exceeded her business development objectives.

221.

Huels' younger male peer BDMs did not achieve the same level of success in business development or sales.

222.

On November 4, 2022, Huels received a Workday notification that her internal "title change" had been approved, this time to "Sales Executive."

223.

The notification stated, "Business title change has been approved. Your Business Title has been changed; however, this does not change your Job or Position."

224.

No manager or HR employee communicated to Huels why this title change was made.

**Daigle prematurely terminates Huels by PowerPoint deletion.**

225.

On November 7, 2022, while Huels was on vacation, Daigle presented an "ISG AI Business Update" to Lenovo management.

226.

On Page 6 of the presentation, Daigle had an organization chart where he put a rectangular block over the NA Business Development position (which was where Huels' face would normally be for her position). The block said "TBD," which meant "To Be Determined."

227.

On Page 5 of the presentation, there is a rectangular block with TBD again, and a TBH ("To Be Hired") AI Business Development Manager role reporting to Borsotto. This was Huels' role.

228.

Daigle placed this AI Business Development Manager position on a band below Borsotto.

229.

Borsotto's title was listed as "WW Business Development Manager."

230.

The organizational chart confirmed that all the Regional Business Development Leaders would report to Borsotto as the WW Business Team Lead.

231.

Daigle had never told Huels that her job was in jeopardy, or that she would report to Borsotto.

232.

Throughout her employment, Daigle and Tease routinely made derogatory comments about Huels to her younger male peers.

233.

Daigle and Tease routinely excluded her from meetings and events at Corporate HQ and rejected her travel requests, even if they involved her assigned business partners or to accept industry awards.

234.

Daigle and Tease sent her one or two insulting emails a week (often copying her peers).

235.

Lenovo refused to pay Huels a $1,000 customer reference award payment (from [REDACTED]) that had been approved. Huels had worked for over a year to receive this customer reference.

236.

Daigle routinely harassed Huels over her expense reports for travel related expenses, causing her to incur late payment fees on her corporate credit card, or to have it suspended. Sometimes, her corporate credit card would be declined when she was checking into hotels.

237.

Daigle and Tease would also deny Huels the opportunity to travel to speak at business conferences or would question their necessity.

238.

For example, Huels was offered an opportunity to speak in November 2022 at a Loss Prevention Foundation Board meeting in Charlotte, North Carolina, with numerous leaders of North American Retail companies. Even though her only expense would be gas and hotel, Daigle rejected the request.

239.

Daigle and Tease similarly showed disrespect towards Crystal Crawford because she was an older female. She was often in tears. Fortunately, she was able to stay in the same role as WW NVIDIA Alliance Lead but transfer to another department within Lenovo.

**The other LinkedIn post.**

240.

On November 8, 2022, Tease sent Huels an email titled "Subject: Really? This again."

241.

Tease admonished Huels for unintentionally having the NVIDIA logo in the background of a LinkedIn post.

242.

Tease's tone was demeaning and disrespectful:

> Out on LinkedIn and what do I see. This picture on an Nvidia background talking about Jensen. Did we not have a discussion on the sensitivity of this for Intel? I searched more and this isn't the only Nvidia leaning post. You may not agree with how you are funded but the fact is that currently until Intel cuts us off because of things like this they are funding your role to help us grow. Really disappointed to see this Andi. Will make for a very fun 1on1 for me tomorrow with [REDACTED] at Intel.

243.

Huels responded to Tease immediately: "That's [the VP Technology Transformation and R&D] from [one of the largest retailers in the U.S.] in the picture with me. Deloitte has a partnership with NVIDIA, and we were both at their AI Forum, hence the background."

244.

Huels also stated that: "I'm not connected with [the Intel employee Tease referred to in his email] on LinkedIn, nor do I know him, so I doubt what I post on LinkedIn would come up tomorrow."

245.

Huels believes that Tease forwarded the post to [the Intel employee he referred to in his email].

246.

Huels suggested: "I would focus the conversation on the $[REDACTED] in new business I've generated for Intel (see attached) and the $[REDACTED] in pipeline I've built, all with Intel content." She also forwarded a video from the Edge AI Summit for Tease to share with [REDACTED] to show how she's "profiled Intel as a thought leader at industry conferences." Huels also attached the LinkedIn picture of her with Pat Gelsinger, Intel's CEO.

247.

Tease never responded.

248.

Tease and Daigle fabricated an after-the-fact justification for terminating Huels, an older female, to conceal their deliberate

misappropriation of Intel's "[REDACTED] Funds" to incentivize her to develop business with Intel's competitor, NVIDIA.

**Lenovo terminates Huels.**

249.

On November 11, 2022, Daigle and Arielle Ballard in Human Resources terminated Huels allegedly because Intel "pulled" the funding for her position.

250.

This reason for termination was a pretext for discrimination because Daigle and Tease had already chosen to fire Huels, as evidenced by Lenovo posting her position on October 31, 2022, and Daigle presenting the two slides "LENOVO AI – ORG" (slide 5 with TBD & TBH) and "LENOVO AI – RESPONSIBILITY MATRIX" (slide 6 with TBD)" on November 7, 2022.

251.

This was also a pretextual reason for discrimination because Daigle had previously promised Huels that her position would become Lenovo-funded by the end of the fiscal year (March 31, 2023).

252.

There were other positions available within Lenovo, but Daigle chose to terminate Huels rather than allow her to apply for them.

253.

Just before her termination, Engatica named Huels one of the "Top 50 Most Powerful Women in Tech 2023." Three Lenovo executives praised her for receiving the reward, but Tease, Daigle, and Corradino refused to even acknowledge it.

254.

Project Voice also named Huels to its "Women Leaders of Conversational AI, Class of 2023."

**Exit Interview.**

255.

Because Huels had already applied for disability leave for a medical procedure before her termination, Lenovo extended her last day of employment until December 19, 2022.

256.

After her termination, Lenovo's Human Resources Director, WW Sales & Marketing, Betty Jo Armstong, conducted an exit interview with Huels.

257.

Huels reported Daigle and Tease for the discrimination they had subjected her to throughout her employment until her termination because she was an older female.

258.

Huels also reported Daigle and Tease for their unethical conduct, alleging that they knowingly used Intel Market Development Funds to pay her salary (while concealing this fact from her) to boost sales for Intel's competitor, NVIDIA.

259.

Armstrong suggested that Huels file an Ethics Complaint and sent her an email link with instructions on how to do so, but Huels did not file such a complaint.

260.

But Armstrong never investigated Huels' discrimination or ethics complaints.

**Lenovo replaces Huels.**

261.

Lenovo replaced Huels with a substantially younger male, Allen Holmes.

262.

Holmes filled the position of NA AI Business Development Manager that Lenovo posted on October 31, 2022.

263.

Holmes performs the same role Huels did to this day, reporting to his supervisor, Borsotto.

264.

These discriminatory acts inflicted financial harm, damaged Huels' reputation and career, and caused her emotional distress.

**COUNT ONE**
**DISCRIMINATION UNDER TITLE VII**
**(FAILURE TO PAY INCENTIVE-BASED COMPENSATION)**

265.

Plaintiff incorporates Paragraph's 2, 9, 28, 30-37, 56-70, 137-87, 221, and 264 here.

266.

Plaintiff is a female whom Defendant employed.

267.

Defendant is an employer subject to Title VII.

268.

Plaintiff accepted Defendant's offer for incentive-based compensation where she could earn twenty percent of her salary if she achieved 100% of her performance targets, or more if she over-achieved.

269.

Defendant thwarted her efforts to receive her full incentive-based compensation because of her sex.

270.

Despite her strong performance, Defendant paid Plaintiff's younger male peer Business Development Managers a significantly higher percentage of their incentive-based compensation.

271.

Besides the financial impact, this discriminatory act caused Plaintiff emotional distress and anxiety.

272.

As a result of Defendant's discriminatory act, Plaintiff is entitled to recover the relief requested below.

**COUNT TWO**
**DISCRIMINATION UNDER TITLE VII**
**(DISCRIMINATORY RAISE)**

274.

Plaintiff incorporates Paragraph's 2, 9, 56, 58-66, 178, 264, and 266-67 here.

275.

Despite her strong performance, Defendant gave Plaintiff's younger male peer Business Development Managers more substantial annual raises.

276.

Defendant did not give Plaintiff as much of a raise as her younger male peers because of her sex.

277.

Besides the financial impact, this discriminatory act caused Plaintiff emotional distress and anxiety.

278.

As a result of Defendant's discriminatory act, Plaintiff is entitled to recover the relief requested below.

## COUNT THREE
## DISCRIMINATION UNDER TITLE VII
## (FAILURE TO PROMOTE)

279.

Plaintiff incorporates Paragraph's 2, 9, 28, 30-37, 56-70, 188-213, 218, 221, 227, 231, 264, and 266-67 here.

280.

Plaintiff was a female employed by Defendant.

281.

Defendant promoted Nicholas Borsotto, a substantially younger and less experienced male, instead of Plaintiff.

282.

Defendant did not post the position, which robbed Plaintiff from being able to apply or express interest in the position.

283.

At the time of this promotion, Defendant knew that Plaintiff wanted a role where she could leverage her experience with NVIDIA and not be in an Intel-funded position.

284.

Plaintiff was substantially more qualified than Borsotto for this position.

285.

She had more managerial, AI, marketing, and business development experience.

286.

By any objective measure, Huels job performance was superior to Borsotto's.

287.

Daigle and Tease had a discriminatory animus towards Plaintiff and Crystal Crawford, another older female AI team member working for them.

288.

Although nothing in their job descriptions limited their promotion opportunities, Daigle communicated to the entire AI team that Plaintiff and Crawford were non-management track employees.

289.

If Plaintiff had received this promotion, she would not have been terminated on November 11, 2022.

290.

Defendant did not promote Plaintiff because of her sex.

291.

Besides the financial impact, this discriminatory act caused Plaintiff emotional distress and damaged her career.

292.

As a result of Defendant's discriminatory acts, Plaintiff is entitled to recover the relief requested below.

## COUNT FOUR
## DISCRIMINATION UNDER TITLE VII
## (TERMINATION)

293.

Plaintiff incorporates Paragraph's 2, 11-15, 21-31, 38-136, 146, 178, 181, 214-264, and 266-67 here.

294.

Defendant terminated Plaintiff because of her sex.

295.

Before Intel cut the funding that Lenovo used to fund Plaintiff's salary, Defendant had already decided to terminate Plaintiff.

296.

Before it communicated her termination, Defendant had already posted her job.

297.

Before it communicated her termination, Defendant had already shown an organization chart to senior leadership where he blocked Plaintiff's face and indicated that a replacement would be hired.

298.

Defendant replaced Plaintiff with a substantially younger male.

299.

Besides the financial impact, this discriminatory act caused Plaintiff emotional distress and damaged her career.

300.

As a result of Defendant's discriminatory act, Plaintiff is entitled to recover the relief requested below.

**COUNT FIVE**
**DISCRIMINATION UNDER THE ADEA**
**(FAILURE TO PAY BONUS COMPENSATION)**

301.

Plaintiff incorporates Paragraph's 2, 9, 28, 30-37, 56-70, 137-87, 221, and 264 here.

302.

Plaintiff was 56-57 years old when she was employed by Defendant.

303.

Defendant is an employer subject to the ADEA.

304.

Plaintiff accepted Defendant's offer for incentive-based compensation where she could earn an additional twenty percent of her salary if she achieved 100% of her performance targets (or more if she over-achieved).

305.

Defendant thwarted her efforts to receive her full incentive-based compensation because of her age.

307.

Despite her strong performance, Defendant paid Plaintiff's younger male peer Business Development Managers a significantly higher amount of their incentive-based compensation.

308.

Besides the financial impact, this discriminatory act caused Plaintiff emotional distress and anxiety.

309.

As a result of Defendant's discriminatory act, Plaintiff is entitled to recover the relief requested below.

## COUNT SIX
## DISCRIMINATION UNDER THE ADEA
## (DISCRIMINATORY RAISE)

310.

Plaintiff incorporates Paragraph's 9, 56, 58-66, 178, 264, and 302-303 here.

311.

Plaintiff was 56-57 years old when she was employed by Defendant.

312.

Despite her strong performance, Defendant gave Plaintiff's younger male peer Business Development Managers more substantial annual raises.

313.

Defendant did not give Plaintiff as much of a raise as her younger male peers because of her age.

314.

Besides the financial impact, this discriminatory act caused Plaintiff emotional distress and anxiety.

315.

As a result of Defendant's discriminatory act, Plaintiff is entitled to recover the relief requested below.

**COUNT SEVEN
DISCRIMINATION UNDER THE ADEA
(FAILURE TO PROMOTE)**

316.

Plaintiff incorporates Paragraph's 9, 28, 30-37, 56-70, 188-213, 218, 221, 227, 231, 264, and 302-03 here.

317.

Plaintiff was 56-57 years old when she was employed by Defendant.

318.

Defendant promoted a substantially younger male, Nicholas Borsotto, instead of Plaintiff.

319.

Defendant did not post the position, which robbed Plaintiff from being able to apply or express interest in the position.

320.

At the time of this promotion, Defendant knew that Plaintiff wanted a role where she could leverage her experience with NVIDIA and not be in an Intel funded position.

321.

Plaintiff was substantially more qualified than Borsotto for this position.

322.

She had more managerial, AI, marketing, and business development experience.

323.

By any objective measure, Huels Lenovo job performance was superior to Borsotto's.

324.

Daigle and Tease had a discriminatory animus towards Plaintiff and Crystal Crawford, another older female member of the AI team working for them.

325.

Although there was nothing in their job descriptions limiting their promotion opportunities, Daigle communicated to the entire AI team that Plaintiff and Crawford were non-management track employees.

326.

If Plaintiff would have received this promotion, she would not have been terminated on November 11, 2022.

327.

Defendant did not promote Plaintiff because of her age.

328.

Besides the financial impact, this discriminatory act caused Plaintiff emotional distress and damaged her career.

329.

As a result of Defendant's discriminatory act, Plaintiff is entitled to recover the relief requested below.

## COUNT EIGHT
## DISCRIMINATION UNDER THE ADEA
## (TERMINATION)

330.

Plaintiff incorporates Paragraph's 2, 11-15, 21-31, 38-136, 146, 178, 181, and 214-264, and 302-03 here.

331.

Defendant terminated Plaintiff because of her age.

332.

Before it communicated her termination, Defendant had already posted her job.

333.

Before Intel cut funding that Lenovo had used to fund the salary for her position, Defendant had already made the decision to terminate Plaintiff.

334.

Defendant replaced Plaintiff with a substantially younger male.

335.

Besides the financial impact, this discriminatory act caused Plaintiff emotional distress and damaged her career.

336.

As a result of Defendant's discriminatory act, Plaintiff is entitled to recover the relief requested below.

## COUNT NINE
## BREACH OF CONTRACT

### 337.

Defendant offered Plaintiff a position to work for it remotely in Georgia.

### 338.

Defendant's offer to Plaintiff included incentive-based compensation that was twenty percent of her salary if she met her performance goals, or more if she over-achieved. This compensation was due monthly.

### 339.

Plaintiff accepted the offer.

### 340.

Defendant engaged in bad faith behaviors that thwarted Plaintiff's ability to earn more of the promised incentive-based compensation that she was due.

### 341.

This was a breach of the contract and the implied duty of good faith and fair dealing.

### 342.

As a result of Defendant's breach of contract, Plaintiff was deprived of the incentive-based compensation she was due.

WHEREFORE, Plaintiff prays for the following relief:

a.     That Summons issue requiring Defendant to answer the Complaint within the time provided by law;

b.     That Plaintiff be awarded a declaratory judgment that Defendant violated the Title VII and the ADEA;

c.     That Plaintiff be awarded a declaratory judgment that Defendant breached its contract with Plaintiff;

d.     That Plaintiff recover from Defendant back pay and benefits with pre-judgment interest;

e.     That Plaintiff recover compensatory damages against Defendant in an amount to be determined by a jury;

f.     That Plaintiff recover punitive damages against Defendant in an amount to be determined by a jury;

g.     That Plaintiff recover liquidated damages against Defendant in an amount equal to any amount awarded for back pay and benefits;

h.     That the Court order injunctive or equitable relief to reinstate Plaintiff or in lieu of reinstatement provide front pay and benefits;

i.     That the Court order Defendants to pay the incentive-based compensation she should have received;

j.     That Plaintiff recover attorney's fees and costs of litigation under the Title VII, the ADEA, and any other applicable federal or state law;

k.     That the Court award Plaintiff any other or further relief as it deems

necessary and proper, or equitable and just.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL COUNTS**

Respectfully submitted this 30th day of May, 2024.

T. Robert Reid, LLC

<u>s/ Tilden Robert Reid, II</u>
T. Robert Reid
Ga. Bar No. 600138
1030 Woodstock Road
Suite 3112
Roswell, Georgia  30075
Telephone (678) 743-1064
Facsimile (404) 549-4136
robreidattorney@gmail.com

Attorney for Plaintiff